**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| RICHARD MARTIN, derivatively on behalf of FISERV, INC., <br><br> Plaintiff, <br><br> v. <br><br> FRANK J. BISIGNANO, MICHAEL P. LYONS, STEPHANIE E. COHEN, HENRIQUE DE CASTRO, HARRY F. DISIMONE, LANCE M. FRITZ, AJEI S. GOPAL, WAFAA MAMILLI, DOYLE R. SIMONS, KEVIN M. WARREN, AND CHARLOTTE B. YARKONI, <br><br> Defendants, <br> and <br><br> FISERV, INC., <br><br> Nominal Defendant. | Civil Action No.: <br><br><br> JURY TRIAL DEMANDED |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Richard Martin ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Fiserv, Inc., ("Fiserv" or the "Company"), brings this Verified Stockholder Derivative Complaint (the "Complaint") against Fiserv's Board of Directors (the "Board") and certain of its executive officers ("Defendants" or "Individual Defendants") to remedy Defendants' breaches of fiduciary duties and violations of federal law. Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in various lawsuits, and other matters of public record.

## NATURE OF THE ACTION

1.     This stockholder derivative action is brought by Plaintiff on behalf of Fiserv against certain of its current and former officers and members of the Company's Board of Directors for breaches of their fiduciary duties and violations of federal securities laws between at least July 24, 2024 and October 29, 2025 (the "Relevant Period"), as set forth below.

2.     Fiserv holds itself out as a global provider of transaction processing software for banks and retail merchants. Fiserv's flagship product and most important growth driver is Clover, which provides merchants with a payment "gateway" to facilitate the secure processing of credit, debit, and mobile payment transactions on behalf of financial institutions and their customers. Clover revenue is primarily generated from transaction fees paid by merchants, which are computed as a percentage of the dollar value for goods and services charged through Clover. Fiserv positioned Clover as a comprehensive "operating system for small businesses" that also generates revenue from POS hardware sales and expensive subscription-based value-added services ("VAS") like payroll administration software, merchant financing, and cash flow management solutions.

3.     Beginning in July 2024, Fiserv misled investors by artificially inflating its growth numbers through compelled migration of legacy customers using Payeezy, the Company's older point-of-sale ("POS") platform, to Clover, its expensive and feature-heavy POS platform. As this

forced migration increased Fiserv's headline growth numbers, Defendants falsely claimed that this growth was being driven by new customers organically signing up for Clover. The market learned that this growth was unsustainable when a substantial portion of these migrated customers abandoned Fiserv altogether in favor of less-expensive competing products like Square and Toast.

4. Fiserv investors have been focused on growth trends in Clover's gross payment volume ("GPV"), which represents the total monetary value of transactions processed through the Clover platform. Accelerating GPV growth rates indicate an expanding number of new merchants on Clover, which translate into sustainable revenue growth. On the other hand, decelerating GPV growth rates signal a slower uptake of new merchants or the loss of existing merchants on the Clover platform (i.e., attrition). During the Class Period, the Company claimed that it closely tracked GPV trends and merchant attrition. For instance, Fiserv's then-CEO, Frank Bisignano ("Bisignano"), stated that "we have the benefit of looking at attrition rates from everything."

5. At a November 2023 investor conference, Defendant Bisignano presented strategies to accelerate Clover's revenue growth, including expansion of its direct sales force and increasing VAS revenue through product innovation. At the conference, Fiserv reiterated key financial targets, including Clover revenue of $3.5 billion in 2025 and $4.5 billion in 2026. According to Defendants, Fiserv would primarily achieve these targets by signing up new Fiserv merchants onto Clover, instead of moving existing Fiserv merchants on other platforms (its so-called "back book") to Clover. Specifically, Defendants told investors that 90% of Clover revenue growth was, and would continue to be, generated from new Fiserv merchants, while only 10% would come from back book merchants who proactively switched to Clover. In fact, Defendants acknowledged that the higher-priced Clover platform was impractical for many smaller merchants within its back book who did not require Clover's VAS functions. These representations were important to investors because Fiserv's ability to effectively sign-up new merchants to the Clover platform was indicative of the sustainability of Cover's revenue growth.

6. During 2023, Fiserv began to phase out Payeezy, its older payment gateway for small business merchants. Payeezy was cheaper for small business merchants and provided them

with basic e-commerce functions. Notwithstanding its "very moderate assumptions for back book conversions," Fiserv forcibly migrated as many as 200,000 merchant locations on Payeezy to Clover from late 2023 through the first half of 2024. This back book conversion provided a rapid boost to Clover revenue and GPV. Specifically, the Company reported Clover revenue of $2.7 billion on GPV of $310 billion for 2024, accounting for half of Fiserv's year-over-year revenue growth. Unbeknownst to investors, Clover's 2024 Revenue and GPV growth were boosted by these forced migrations. Furthermore, the legacy Payeezy merchants were leaving Clover *en masse* for competitors like Square and Toast because Clover was much more expensive than Payeezy and provided functions they did not need or want.

7.      Throughout the second half of 2024 and the first half of 2025, Defendants continued to tout Clover's growth prospects while failing to disclose that Clover GPV growth was decelerating due to attrition from former Payeezy customers that had been forcibly moved to Clover. Fiserv executives later admitted that this attrition began relatively quickly and was largely driven by price-sensitive Payeezy merchants seeking lower-cost alternatives such as Square, Toast, and Shopify, as they were not utilizing Clover's expensive hardware and VAS solutions. In addition, poor customer service and other operational issues further drove merchant attrition on Clover.

8.      In this way, the Board permitted the Company's executives to cause the company to engage in securities fraud, artificially inflating the share price of Fiserv stock as alleged in two different shareholder securities fraud class action lawsuits. At the same time, the Board engaged the Company in a massive share buy-back program in which the Company purchased tens of millions of Fiserv shares on the open market – massively over-paying for the Company's shares and supporting the stock price by creating demand on the open market.

9.      While the Company's false and misleading statements to the market and the Company's massive buy-back program artificially inflated the Company's share price, Defendant's Simon and Brisignano took advantage of their knowledge of material non-public information and sold massive amounts of their own stock to reap hundreds of millions of dollars of insider trading proceeds. For example, on July 22, 2025 Bisignano sold more than 287,000 shares at $166 for

proceeds of almost $48 million. The next day the Company reported disappointing results to the market and the stock price immediately dropped 14%.

10.     The Individual Defendants' conduct has now subjected the Company to significant liability in two different securities fraud class action lawsuits, and caused the Company to massively over-pay for millions of shares of the Company's publicly traded stock. Moreover, and although obligated to do so, the Individual Defendants refuse to clawback or sue former CEO Bisignano for his ill-gotten insider trading proceeds and unearned compensation.

## JURISDICTION & VENUE

11.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

12.     This Court has personal jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

13.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds $75,000 and based on information and belief Plaintiff is a citizen of a different state than each Defendant.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein occurred in this District; and (iv) the Individual

4

Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

15.     In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

**Plaintiff**

16.     Plaintiff Richard Martin was a stockholder of Fiserv at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Fiserv stockholder. Plaintiff is a resident of Texas.

**Nominal Defendant**

17.     Nominal defendant Fiserv, Inc. is a Wisconsin Corporation with principal executive offices at 600 N. Vel. R. Phillips Avenue, Milwaukee, Wisconsin 53203 and was founded in 1984. Fiserv's common stock trades on the NASDAQ Global Select Market under the ticker symbol "FISV." Fiserv holds itself out as a financial services and financial technology provider, offering digital banking platforms and payment solutions to enterprise, small business, and public institutional clients.

**Individual Defendants**

18.     Defendant Frank J. Bisignano ("Bisignano") served as served as Fiserv's CEO from 2020, and Chairman of Fiserv's Board of Directors from 2022, until his resignation from both positions on May 6, 2025. On information and belief, Defendant Bisignano is a resident of New Jersey. Fiserv paid Defendant Bisignano the following compensation since 2020:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2024 | $1,400,000 | $22,016,635 | - | - | $357,848 | **$23,774,483** |
| 2023 | $1,400,000 | $23,252,867 | - | $3,000,000 | $290,891 | **$27,943,757** |

5

| | | | | | | |
|---|---|---|---|---|---|---|
| 2022 | $1,320,000 | $16,210,972 | - | - | $291,588 | **$17,822,560** |
| 2021 | $1,320,000 | $16,120,519 | - | $2,683,000 | $261,689 | **$20,385,208** |
| 2020 | $349,533 | $5,600,045 | $5,600,045 | - | $644,316 | **$12,193,925** |

19. Defendant Michael P. Lyons ("Lyons") has been Fiserv's Chief Executive Officer ("CEO") and a Fiserv director since May 6, 2025. Prior to assumption of his role as CEO, Defendant Lyons was Fiserv's President and CEO-elect since January 27, 2025. On information and belief, Defendant Lyons is a resident of New York.

20. Defendant Stephanie E. Cohen ("Cohen") has been a Fiserv director since March 2025. Defendant Cohen has been a member of Fiserv's Audit Committee and Risk Committee since joining the Board. On information and belief, Defendant Cohen is a resident of Utah. Fiserv paid and is expected to pay Defendant Cohen the following compensation during the Relevant Period:[1]

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $130,000 | $230,000 | **$360,000** |

21. Defendant Henrique de Castro ("de Castro") has been a Fiserv director since 2019. Defendant de Castro has been a member of Fiserv's Audit Committee since at least May 2020 and Fiserv's Talent and Compensation Committee since at least May 2022. On information and belief, Defendant de Castro is a resident of California. Fiserv paid and is expected to pay Defendant de Castro the following compensation during the Relevant Period:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $130,000 | $230,000 | **$360,000** |
| 2024 | $130,000 | $230,035 | **$360,035** |

22. Defendant Harry F. DiSimone ("DiSimone") has been a Fiserv director since 2018. Defendant DiSimone has been a member of Fiserv's Risk Committee since at least 2020 and

---

[1] Fiserv's most recent Proxy Statement dated April 2, 2025 for the Period Ending March 14, 2025, provides its 2024 non-employee director compensation program. Fiscal Year 2025 compensation is estimated based on the 2024 compensation plan, which is reviewed by Fiserv biannually and was last reviewed in 2024. The plan provides: Annual Equity Award of $230,000, Board Fee of $100,000, Annual Lead Director Equity Award of $75,000, Committee Fee of $15,000, and Committee Chair Fee of $20,000 or $25,000 if the director chairs the Audit Committee.

Fiserv's Audit Committee since 2022. On information and belief, Defendant DiSimone is a resident of New York. Fiserv paid and is expected to pay Defendant DiSimone the following compensation during the Relevant Period:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $130,000 | $230,000 | **$360,000** |
| 2024 | $150,000 | $230,035 | **$380,035** |

23. Defendant Lance M. Fritz ("Fritz") has been a Fiserv director since 2024. Defendant Fritz has been a member of Fiserv's Audit Committee since 2024 and served as the chair of Fiserv's Nominating and Corporate Governance Committee since 2024. On information and belief, Defendant Fritz is a resident of Nebraska. Fiserv paid and is expected to pay Defendant Fritz the following compensation during the Relevant Period:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $135,000 | $230,000 | **$365,000** |
| 2024 | $113,214 | $280,665 | **$393,879** |

24. Defendant Ajei S. Gopal ("Gopal") has been a Fiserv director since 2024. Defendant Gopal has been a member of Fiserv's Risk Committee and Talent and Compensation Committee since 2024. On information and belief, Defendant Gopal is a resident of Pennsylvania. Fiserv paid and is expected to pay Defendant Gopal the following compensation during the Relevant Period:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $130,000 | $230,000 | **$360,000** |
| 2024 | $104,286 | $266,191 | **$370,477** |

25. Defendant Wafaa Mamilli ("Mamilli") has been a Fiserv director since 2021. Defendant Mamilli has been a member of Fiserv's Nominating and Corporate Governance Committee and Risk Committee since 2022, where she has served as the Risk Committee's chair since May 2025. On information and belief, Defendant Mamilli is a resident of California. Fiserv

7

paid and is expected to pay Defendant Mamilli the following compensation during the Relevant Period:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $135,000 | $230,000 | **$365,000** |
| 2024 | $130,000 | $230,035 | **$360,035** |

26.     Defendant Doyle R. Simons ("Simons") has been a Fiserv director since 2007 and has served as Lead Director since 2022 before his appointment as Chairman on May 6, 2025. Defendant Simons has been a member of the Talent and Compensation Committee since at least 2020 and has served as Chair since 2022. Defendant Simons has been a member of the Nominating and Corporate Governance Committee since 2023. On information and belief, Defendant Simons is a resident of Washington. Fiserv paid and is expected to pay Defendant Simons the following compensation during the Relevant Period:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $135,000 | $305,000 | **$440,000** |
| 2024 | $140,000 | $305,060 | **$450,060** |

27.     Defendant Kevin M. Warren ("Warren") has been a Fiserv director since 2020. Defendant Warren has been a member and served as Chair of the Audit Committee since 2022. Mr. Warren has been a member of the Talent and Compensation Committee since 2021. On information and belief, Defendant Warren is a resident of California. Fiserv paid and is expected to pay Defendant Warren the following compensation during the Relevant Period:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $140,000 | $230,000 | **$370,000** |
| 2024 | $152,500 | $230,035 | **$382,535** |

28.     Defendant Charlotte B. Yarkoni ("Yarkoni") has been a Fiserv director since 2023. Defendant Yarkoni has been a member of the Audit Committee and Risk Committee since 2023.

On information and belief, Defendant Yarkoni is a resident of California. Fiserv paid Defendant Yarkoni the following compensation during the Relevant Period:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $130,000 | $230,000 | **$360,000** |
| 2024 | $130,000 | $230,035 | **$360,035** |

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

29.    By reason of their positions as officers and/or directors of Fiserv, and because of their ability to control the business and corporate affairs of Fiserv, the Individual Defendants owed Fiserv and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Fiserv in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Fiserv and its shareholders.

30.    Each director and officer of the Company owes to Fiserv and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

31.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Fiserv, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.    To discharge their duties, the officers and directors of Fiserv were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Fiserv, the absence of good faith on

their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

33. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to affect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

34. To discharge their duties, the officers and directors of Fiserv were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Fiserv were required to, among other things:

    (i)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Wisconsin and the United States, and pursuant to Fiserv's own Corporate Charter and Code of Conduct;

    (ii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

    (iii)    Remain informed as to how Fiserv conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

    (iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Fiserv and procedures for the reporting of

the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)      Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Fiserv's operations would comply with all applicable laws and Fiserv's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)      Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)      Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and,

(viii)      Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

35.      Each of the Individual Defendants further owed to Fiserv and its shareholders the duty of loyalty requiring that each favor Fiserv's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their positions in Fiserv, or knowledge of the affairs of the Company, to gain personal advantage.

36.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Fiserv and were at all times acting within the course and scope of such agency.

37.      Because of their advisory, executive, managerial, and directorial positions with Fiserv, each of the Individual Defendants had access to adverse, non-public information about the Company.

38.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Fiserv.

## FISERV'S GOVERNANCE GUIDELINES

39.      Fiserv's Governance Guidelines state the "Role of the Board" is "to maximize long-term shareholder value, ensure the Corporation conducts its business in a highly ethical manner

and create an environment that respects and values all employees and promotes corporate responsibility."

40.     Fiserv's Governance Guidelines specifically state "the Board's responsibilities include," in relevant part:

> Selecting, monitoring, evaluating, compensating and, if necessary, replacing the Chief Executive Officer and other senior executives;
>
> Monitoring and encouraging ethical behavior and compliance with laws, regulations and corporate policies.

## FISERV'S CODE OF CONDUCT

41.     Fiserv's Code of Conduct & Business Ethics ("Code of Conduct"), effective for calendar years 2024 and 2025, "applies to all Fiserv employees and board members, (collectively referred to as 'associates')" and the Company is clear that "we expect [associates] to read and know the Code, to follow both its letter and spirit, and to use it as [the associates'] moral compass."

42.     Under a section titled "Our Responsibilities," the Code of Coduct states:

> "We are all responsible for protecting and promoting the Fiserv brand so that we continue to be recognized for our… high ethical standards."

The Code of Conduct goes on to list associates' responsibilities, which include to:

> (i)     Model appropriate behavior at all times; each of us, especially managers, must act with integrity and inspire trust…
>
> (ii)    Be forthright and honest in all of your business dealings and comply with all applicable laws.

43.     Under a section titled "Speaking Up," the Code of Conduct stresses that Fiserv associates should "[r]eport violations of the code immediately, so they can be addressed promptly," and that reports of such ethical violations "will be assigned and investigated by a neutral, independent investigator."

44.     Under a section titled "Do The Right Thing," the Code of Conduct states, in relevant part:

**Insider Trading**

In the course of [associates'] job, you may possess inside information about Fiserv or other companies with whom we deal. Inside information is information that is both material and nonpublic.

If you possess material, nonpublic information about Fiserv or other companies, you may not trade while in possession of the information or share that information with others.

45. The Code of Conduct's Insider Trading Policy includes the affirmative pledge that, "As a Fiserv associate, I will: trade stock only after material information in my possession has become publicly available."

## FISERV'S AUDIT COMMITTEE CHARTER

46. Fiserv's Audit Committee Charter states:

The primary function of the Audit Committee (the "Committee") is to provide independent review and oversight of the integrity of the Corporation's accounting and financial reporting processes and financial statements, the system of internal controls that management and the Board of Directors have established, the independent auditors' qualifications and independence, the performance of the Corporation's internal audit function and the Corporation's compliance with legal and regulatory requirements. In doing so, it is the responsibility of the Committee to provide an open avenue of communication between the Board of Directors, management, Fiserv Corporate Audit Services and the independent registered public accounting firm (the "independent auditor").

47. Under the section titled "Review of Financial Statements and Disclosures," the Audit Committee Charter states, in relevant part:

Review of Financial Statements — The Committee shall review and discuss the financial statements and related disclosures with management and the independent auditor, including interim financial statements and annual financial statements, disclosures made in management's discussion and analysis of financial condition and results of operations and the independent auditor's report with respect to the Corporation's financial statements.

Earnings Releases and Other Significant Disclosures — The Committee shall discuss with management the Corporation's earnings press releases, including the use of non-GAAP information, the Corporation's earnings guidance, and other significant disclosures, such as the Corporation's corporate social responsibility report.

## FISERV'S NOMINATING AND CORPORATE GOVERNANCE COMMITTEE CHARTER

48.     Fiserv's Nominating and Corporate Governance Committee's Charter states: The Nominating and Corporate Governance Committee (the "Committee") recommends qualified nominees to the Board for appointment or election by the shareholders, is responsible for corporate governance matters, and provides oversight of the Corporation's corporate social responsibility programs and practices.

49.     Under the section titled "Governance," the Nominating and Corporate Governance Committee Charter states, in relevant part, that the Nominating and Corporate Governance Committee shall:

Monitor the independence, both in appearance and in fact, of current directors and nominees, and consider situations that involve actual or potential conflicts of interest that may impact director independence.

Review and assess the channels through which the Board receives information and the quality and timeliness of information received.

Review the performance of the Chairman annually, provide feedback to the Chairman, and take such performance into account when making Board leadership recommendations.

Oversee the annual evaluation of the Chief Executive Officer and other members of management by the Board.

Review and recommend changes to the Governance Guidelines of the Corporation.

## FISERV'S COMPENSATION RECOUPMENT POLICY

50.     Fiserv has adopted a Compensation Recoupment Policy, which describes "the circumstances under which Fiserv, Inc. is required to or shall have the right to recover compensation paid to employees and independent contractors (collectively, 'Recipients')."

51.     Fiserv provides such circumstances for the discretionary recovery of compensation (the "Additional Clawback Provisions"), stating in relevant part:

In the event that any current or former Recipient of the Company, its parent(s) or subsidiaries, violates the Company's code of conduct, causes reputational harm to the Company, or violates a restrictive covenant, the Company may recover from

such individual up to the Recoupment Amount. There is no time limit on the Company's ability to recover amounts pursuant to this Section 3, other than limits imposed by law, and the Company may seek recovery from individuals who are no longer employed by the Company or any of its subsidiaries.

52.     On December 3, 2024, a long-term shareholder submitted an SEC Rule 14a-8 proposal (the "Proposal") requesting that the Board strengthen the Company's recoupment policy for unearned executive pay.

53.     On January 10, 2025, the Company asked the SEC for no-action relief to omit the Proposal from its 2025 proxy materials under Rule 14a-8(i)(10), arguing that the Company's existing policy had "substantially implemented " the requested changes. On March 27, 2025, the SEC declined to grant that request, stating that in its view Fiserv "had not substantially implemented the Proposal."

54.     Fiserv further explained in its request for no-action relief that the "Additional Clawback Provisions apply to *all* current and former Company employees (which includes, and is significantly broader in scope than, only [Named Executive Officers])."

55.     In Fiserv's 2025 Proxy Statement, the Board opposed the Proposal, arguing that its current Recoupment Policy is "more expansive than what is required by SEC rules," and "enables the board to clawback compensation from any current or former employee… in a variety of circumstances including where there is a… violation of of our code of conduct or the law." The Proposal was defeated by shareholder vote.

## ADDITIONAL SUBSTANTIVE ALLEGATIONS

56.     Fiserv is a Wisconsin-based global payments and financial technology provider. Its flagship product is the cloud-based, point of sale platform, Clover. Clover is Fiserv's most important growth driver, and during the Relevant Period the Company's success was defined by Clover's ability to generate revenue and expand transaction volumes.

57.     On July 24, 2024, Fiserv began the Relevant Period with an earnings call on which Defendant Bisignano traced Clover's evolution "from seven engineers and three patents" into a global franchise and stressed that Clover was the key to Fiserv's relationships with hundreds of

financial institutions. He told investors they should expect to continue growing at a "double-digit" rate every year.

58.     Investors were encouraged by this outlook and, through early 2025, Fiserv's stock traded on a steadily rising trajectory, reflecting confidence that Clover's high-teens to high-20s growth rates could support durable double-digit expansion for the Company as a whole. On October 28, 2024, Defendant Simons took advantage of Fiserv's stock performance and sold 40,000 shares for approximately $8 million.

59.     In December 2024, President-elect Donald Trump nominated Defendant Bisignano as commissioner of the Social Security Administration. The Senate Finance Committee voted to confirm his appointment in April 2025, and he was confirmed by the full Senate in May 2025.

60.     Simultaneously, the first cracks to Defendant Bisignano's growth story appeared publicly on April 24, 2025, when Fiserv disclosed that Clover's gross payment volume ("GPV") growth had slowed sharply to about 8% in the first quarter of 2025, down from 2024 GPV growth rates between 14% and 17%, even as Clover revenue grew about 27-30% year-over-year. Defendant Lyons attributed the slowdown to lower transaction volumes from merchants who had used the legacy Payeezy platform and had been converted to Clover.

61.     Analysts immediately questioned the sustainability of a model in which revenue growth far outstripped volume growth, with one J.P. Morgan analyst flagging "the widest spread between revenue and volume in our model's history, raising concerns about sustainability of premium growth." Fiserv's share price fell to its July 2024 levels, declining approximately 18-19% on the news.

62.     Within weeks of this disclosure, Fiserv announced a major leadership transition. On May 6, 2025, Bisignano resigned as Chief Executive Officer and Chairman, and President Michael Lyons assumed the CEO role, while Bisignano assumed his role in the federal government.

63.     During this same period, the Board had caused Fiserv to become an aggressive purchaser of its own stock under its share repurchase program, using corporate funds to buy back

approximately 60 million shares on the open market, thereby supporting the same elevated prices at which Bisignano and related entities were selling.

64.     The Board twice expanded the Company's repurchase capacity in the years and months leading up to the corrective disclosures. In February 2023, the Board approved a 75 million share repurchase authorization, and in February 2025 it supplemented that program by authorizing repurchases of up to an additional 60 million shares of Fiserv common stock, even though there were approximately 18 million shares remaining available to purchase from the 2023 repurchase program.

65.     In the second half of 2024, Fiserv repurchased shares for approximately $2.5 billion, representing the difference between Fiserv's FY 2024 repurchases for $5.5 billion and reported first-six-month repurchases for $3 billion.

66.     In 2025, Fiserv repurchased shares for approximately $2.2 billion in the first quarter, $2.2 billion in the second quarter, and an additional $1 billion in the third quarter. In total, Fiserv spent $7.9 billion buying its own shares during the Relevant Period.

67.     Public Form 4 and Form 144 filings, together with press reports summarizing those disclosures, show that between mid-May and late-July 2025 Bisignano (and related entities) sold several million Fiserv shares at prices far above those to which the stock would later fall.  Those sales generated hundreds of millions of dollars in proceeds for Brisignano. During this same period, Defendants caused Fiserv to be a massive ***buyer*** in the open market, repurchasing roughly 19.4 million shares for $3.2 billion while Bisignano was selling.

68.     During this time, Fiserv also continued to reassure the market about Clover's prospects and its overall growth algorithm while Bisignano unloaded his Fiserv shares, culminating in his largest reported sale on July 22, 2025 when he sold 287,072 shares for an average  price of $166.31, generating almost $48 million in proceeds in a single day.

69.     The very next day, on July 23, 2025 Lyons held his first quarterly earnings call as CEO. Fiserv reported second-quarter 2025 results, acknowledged continued pressure in its Merchant Solutions segment, which accounted for Clover, and lowered its 2025 organic revenue

growth guidance to approximately 10%, the low end of the previously communicated 10–12% range. Fiserv also raised the low end of its EPS guidance by $0.05, which Lyons expressly tied to the Company's "increased share repurchase guidance."

70.     As the new CEO, Lyons told investors he had "re-underwritten" the Company's initiatives, described those projects and products as "great," and framed the guidance adjustment as a matter of timing. Lyons emphasized that there were no quality problems with Fiserv's offerings and that the Company would still capture the full strategic and financial benefits over time.

71.     Immediately thereafter, the first securities class action complaint was filed in the Southern District of New York on July 24, 2025, captioned *City of Hollywood Police Officers' Retirement System v. Fiserv, Inc., et al.*, case no. 25-cv-06094-JHR (SDNY) (the "SDNY Class Action"). The SDNY Class Action alleges, among other things, that Defendants Bisignano, Lyons, and Fiserv, along with then-Chief Financial Officer Robert Hau and Chief Accounting Officer Kenneth Best, had artificially inflated Clover's revenue and growth prospects by forcibly converting as many as 200,000 merchants from legacy Payeezy users to Clover platform users.

72.     The SDNY Class Action goes on to describe mounting attrition from Payeezy merchants who were unwilling to pay for the more expensive Clover platform. Rather than pay for Clover, many Fiserv customers had migrated to less expensive Clover competitors. These "headwinds," according to the SDNY Class Action, were known to the named Defendants but not disclosed to investors during the class period.

73.     Despite the SDNY Class Action's allegations, including that the July 23, 2025 disclosure constituted a corrective event that brought Fiserv's stock down approximately 14% to $143.00 per share, the truth of Fiserv's financial condition and forecasting assumptions was still being masked by Defendants. In the wake of Lyons's 're-underwriting' announcement, Fiserv's stock fell but continued to trade above roughly $120 per share through the end of the Relevant Period.

74.     On the earnings call dated October 29, 2025, following what Lyons described as his "first full quarter as CEO," the re-underwriting initiatives were replaced by a "rigorous analysis" of Fiserv's operations. As Lyons explained:

> During the third quarter, my first full quarter as CEO, I worked with a management team and several external advisers to conduct a rigorous analysis of the company's operations, technology, financials and forecasting including thousands of client and employee meetings and external benchmarking. As the new CEO, it was natural for me to push our team to think critically about our businesses and objectively assess long-term value drivers, competitive strengths and weaknesses and ultimately, how we communicate with the investment community. The analysis was integrated into our annual strategic planning process, which starts every August and continues intothe fall, with ongoing communication and interaction with our Board of Directors.

75.     As Lyons later explained, this "rigorous analysis" led Fiserv to conclude that its prior 2025 guidance, including the July 2025 refinement, rested on embedded assumptions about outsized business-volume growth, record sales activity, broad-based productivity improvements, and short-term revenue and expense initiatives that would have been "objectively difficult" to achieve even with "strong execution."

76.     The takeaway from Fiserv's "rigorous analysis" was to slash EPS and revenue guidance, even beyond the already-reduced guidance from July.  Fiserv stock cratered, falling from a closing price of $126.17 on October 28, 2025 to $70.60 on October 29, 2025 – a one-day, 44% drop.

77.      On November 4, 2025, a second securtiies class action was filed in the Eastern District of Wisconsin, captioned *Cypanga Sicav SIF v. Fiserv, Inc., et al.,* case no. 25-cv-01716 (ED WI) (the "ED WI Class Action," together with the SDNY Action, the "Securities Class Actions").

78.     The Securities Class Actions both allege that, during their respective class periods, Fiserv securities traded at artificially inflated prices as a result of the false and misleading statements issued by Defendants and the Company. By issuing false and/or misleading statements and/or omitting material facts necessary to make those statements not false and/or misleading,

while simultaneously causing Fiserv to repurchase its own shares in the open market, Defendants facilitated the Company's participation in securities fraud and enabled Bisignano to sell millions of shares at fraudulently elevated prices based upon material inside information.

79.     Thus, while Fiserv's board and senior officers promoted a narrative of durable double-digit growth anchored in Clover and a purportedly 're-underwritten' 2025 outlook, investors ultimately learned in October 2025 that the Company's growth, margins, and guidance had been sustained by one-time migrations, masked attrition, deferred investment, and short-term initiatives, leaving those who purchased during the Relevant Period holding shares worth less than half the prices at which Bisignano profited.

## DAMAGES TO THE COMPANY

**Securities Class Actions**

80.     The Securities Class Actions allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 against certain executives and the Company.

81.     As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant sums in relation to the Securities Class Actions including any liability or settlement that results therefrom.

**Unjust Compensation**

82.     At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

83.     Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner in compliance with the Corporate Charter and the Company Code of Conduct. Further,

each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described herein, for which they were compensated.

84. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Share Repurchases**

85. As alleged above, while engaging in and/or permitting the misconduct as alleged above, the Individual Defendants caused the Company to repurchase approximately 63 million shares of its own common stock at an inflated, average trading price of approximately $175 during the Relevant Period. As a result, and given the Company's post-Relevant Period trading price of $70 per share, the Company overpaid for its common stock by approximately $6.6 billion, thus causing significant harm to the Company and propped up the stock price enabling Simon and Bisignano to maximize the profits from their sales to the detriment of the Company.

**Insider Trading**

86. As alleged above, Defendants Bisignano and Simons, while in possession of material, non-public information, collectively abused their positions as Company insiders, misappropriated the Company's valuable information, and reaped over $600 million in gross proceeds through their unlawful insider trading which the Company is entitled to disgorge from Bisignano and Simons but has refused to do so.

87. While the Company's stock price was artificially inflated, and on information and belief, Defendant Bisignano and his related accounts reported the following sales of Fiserv common stock during the Relevant Period, as reflected in Form 144 notices filed on May 20, 2025,

June 26, 2025, and August 1, 2025 (the 'Bisignano 144s'), *for total proceeds of approximately*

*$640,000,000*:[2]

| Security | Transaction Date | Number of Shares Sold | Avg. Price Per Share | Total |
|---|---|---|---|---|
| Common | 5/16/25 | 100,000 | $166.84 | **$16,683,943.50** |
| Common | 5/19/25 | 2,418 | $168.64 | **$407,764.99** |
| Common | 5/19/25 | 28,143 | $168.64 | **$4,745,959.53** |
| Common | 5/19/25 | 2,418 | $168.64 | **$407,762.82** |
| Common | 5/19/25 | 28,143 | $168.64 | **$4,745,934.21** |
| Common | 5/19/25 | 2,418 | $168.64 | **$407,764.51** |
| Common | 5/19/25 | 28,143 | $168.64 | **$4,745,953.91** |
| Common | 5/19/25 | 150,182 | $168.61 | **$25,322,922.91** |
| Common | 5/19/25 | 29,054 | $168.61 | **$4,898,937.30** |
| Common | 5/19/25 | 41,051 | $168.61 | **$6,921,810.26** |
| Common | 5/19/25 | 494 | $168.61 | **$83,295.76** |
| Common | 5/19/25 | 15,314 | $168.61 | **$2,582,168.58** |
| Common | 5/19/25 | 9,711 | $168.61 | **$1,637,419.29** |
| Common | 5/19/25 | 25,142 | $168.61 | **$4,239,315.82** |
| Common | 5/19/25 | 4 | $168.62 | **$674.46** |
| Common | 5/19/25 | 6,098 | $168.61 | **$1,028,213.66** |
| Common | 5/19/25 | 68,228 | $168.61 | **$11,504,257.40** |
| Common | 5/19/25 | 24,432 | $168.61 | **$4,119,599.24** |
| Common | 5/19/25 | 10 | $168.62 | **$1,686.15** |
| Common | 5/19/25 | 515 | $168.61 | **$86,836.67** |
| Common | 5/19/25 | 14,352 | $168.61 | **$2,419,961.04** |
| Common | 5/19/25 | 50,444 | $168.61 | **$8,505,610.02** |
| Common | 5/19/25 | 62,438 | $168.61 | **$10,527,977.13** |

---

[2] For each trade date, Plaintiff relies on the Bisignano 144 filed closest in time to that date (the May 20 filing for sales from May 16–19, the June 26 filing for sales from May 20–June 24, and the August 1 filing for sales from June 26–July 31) in order to avoid later inconsistent aggregation in subsequent Form 144s. Later filings restate earlier trades in aggregated blocks, reporting gross-proceeds figures sometimes inconsistent with Fiserv's contemporaneous trading prices. Plaintiff does not attempt to adjust or de-duplicate Defendants' reported inconsistencies.

| | | | | |
|---|---|---|---|---|
| Common | 5/19/25 | 65,649 | $168.61 | **$11,069,399.57** |
| Common | 5/19/25 | 21,382 | $168.61 | **$3,605,323.79** |
| Common | 5/19/25 | 55,657 | $168.61 | **$9,384,115.27** |
| Common | 5/19/25 | 37,573 | $168.61 | **$6,335,040.75** |
| Common | 5/19/25 | 6,438 | $168.61 | **$1,085,486.72** |
| Common | 5/19/25 | 332 | $168.61 | **$55,977.26** |
| Common | 5/20/25 | 100,000 | $166.91 | **$16,690,763.00** |
| Common | 5/27/25 | 1,281 | $160.86 | **$206,057.47** |
| Common | 5/27/25 | 1,281 | $160.91 | **$206,132.02** |
| Common | 5/27/25 | 2,556 | $158.06 | **$404,006.16** |
| Common | 5/27/25 | 204 | $160.79 | **$32,801.17** |
| Common | 5/27/25 | 367 | $160.86 | **$59,034.63** |
| Common | 5/27/25 | 1,122 | $160.91 | **$180,545.74** |
| Common | 5/27/25 | 1,549 | $160.81 | **$249,088.19** |
| Common | 5/29/25 | 100,000 | $159.20 | **$15,920,284.81** |
| Common | 5/30/25 | 200,000 | $160.75 | **$32,149,354.00** |
| Common | 6/4/25 | 86,700 | $162.50 | **$14,088,760.84** |
| Common | 6/4/25 | 19,840 | $162.50 | **$3,223,993.50** |
| Common | 6/4/25 | 19,840 | $162.50 | **$3,223,995.48** |
| Common | 6/4/25 | 11,140 | $162.51 | **$1,810,320.37** |
| Common | 6/4/25 | 100,000 | $164.00 | **$16,399,994.00** |
| Common | 6/5/25 | 100,000 | $165.05 | **$16,504,904.00** |
| Common | 6/6/25 | 2,500 | $389.72 | **$974,291.88** |
| Common | 6/6/25 | 200,000 | $166.62 | **$33,324,424.00** |
| Common | 6/9/25 | 200,000 | $168.79 | **$33,757,904.00** |
| Common | 6/10/25 | 1,665 | $169.51 | **$282,230.82** |
| Common | 6/16/25 | 50,000 | $165.07 | **$8,253,429.00** |
| Common | 6/17/25 | 50,000 | $165.03 | **$8,251,579.00** |
| Common | 6/20/25 | 1,965 | $164.00 | **$322,260.00** |
| Common | 6/23/25 | 250,000 | $168.66 | **$42,165,769.00** |
| Common | 6/24/25 | 213,906 | $173.73 | **$37,161,899.00** |
| Common | 6/26/25 | 50,000 | $171.46 | **$8,572,950.00** |
| Common | 6/27/25 | 150,000 | $172.44 | **$25,865,820.00** |
| Common | 6/30/25 | 7,600 | $173.16 | **$1,315,997.76** |
| Common | 7/1/25 | 74,974 | $172.39 | **$12,925,093.22** |
| Common | 7/3/25 | 150,000 | $174.06 | **$26,108,529.00** |
| Common | 7/7/25 | 20,000 | $175.22 | **$3,504,448.00** |
| Common | 7/21/25 | 154,990 | $166.08 | **$25,740,971.70** |

| Common | 7/22/25 | 287,072 | $166.31 | **$47,742,187.82** |
|--------|---------|---------|---------|---------------------|
| Common | 7/25/25 | 100,000 | $140.46 | **$14,045,969.00** |
| Common | 7/28/25 | 150,000 | $142.47 | **$21,370,740.00** |
| Common | 7/29/25 | 75,000 | $142.04 | **$10,652,805.00** |
| Common | 7/30/25 | 49,900 | $142.56 | **$7,113,868.75** |
| Common | 7/31/25 | 17,950 | $140.22 | **$2,516,862.84** |

88.    While the Company's stock price was artificially inflated, and on information and belief, Defendant Simons made the following sale of Fiserv common stock during the relevant period, *for total proceeds of $8,078,800.00*, as reported to the SEC on October 24, 2024:

| Security | Transaction Date | Number of Shares Sold | Avg. Price Per Share | Total |
|----------|------------------|-----------------------|----------------------|-------|
| Common | 10/23/2024 | 40,000 | $201.97 | **$8,078,800.00** |

89.    As a result, Defendants Bisignano and Simons were unjustly enriched.

**No Clawback**

90.    Despite overwhelming evidence of insider trading and the explicit authority and obligation in Fiserv's governing documents, there is no indication that the Board caused the Company to conduct a good-faith investigation into Defendants Simons' and Bisignano's trades or to pursue any recoupment or disgorgement of incentive-based compensation under the clawback policy.

91.    Brisignano's insider selling has been the topic of articles in the *New York Times* and the *Wall Street Journal*, among other publications. And in November 2025, the ranking members of the Senate Committees on Finance and Banking began investigating Bisignano's stock sell-off. Nevertheless, this reputational damage to the Company has been insufficient to shame the Board of Directors into action.

**Additional Damage to the Company**

92.    As a direct and proximate result of the Individual Defendants' conduct, the Company will lose and expend many millions of dollars. Such expenditures include, but are not

limited to, legal fees and payments associated with the numerous lawsuits and other actions lodged against the Company as a result of the misconduct discussed herein.

93. As a direct and proximate result of the Individual Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock price in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

94. For example, an analyst at investment firm William Blair captured the market's loss of confidence in Fiserv following its October 2025 earnings call, stating: "we encourage investors to focus long-term fintech investments on better-position anmes with greater financial visibility and management credibility," and cited the Q3 2025 results as "difficult to explain and harder to defend."

## DERIVATIVE ALLEGATIONS (DEMAND FUTILITY)

95. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

96. Plaintiff brings this action derivatively on behalf of Fiserv to redress injuries suffered, and to be suffered, by Fiserv because of Defendants' faithless and unlawful misconduct. Plaintiff will adequately and fairly represent the interests of Fiserv in enforcing and prosecuting the derivative claims.

97. Plaintiff will adequately and fairly represent the interests of Fiserv and its shareholdres in enforcing and prosecuting its rights. Plaintiff is a current shareholder of Fiserv and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff has retained counsel competent and experienced in derivative litigation.

98. The current Board of Directors of Fiserv has 10 members: Michael P. Lyons, Stephanie E. Cohen, Henrique de Castro, Harry F. DiSimone, Lance M. Fritz, Ajei S. Gopal, Wafaa

Mamilli, Doyle R. Simons, Kevin M. Warren, and Charlotte B. Yarkoni (the "Director Defendants").

99.     A pre-suit demand on the Fiserv Board is excused in this case because at least a majority of its members are disabled from fairly, independently and objectively considering any pre-suit demand that Plaintiff may have made. As set forth below, all of the Director Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein and have demonstrated unwillingness to vindicate the Company in the application of the Company's extant policies. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

100.    **First**, all Director Defendants participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Fiserv's shareholders or recklessly disregarded the wrongs complained of herein, and are therefore not disinterested parties. As a result of their access to and review of internal corporate documents, conversations and connections with other corporate officers, employees and directors in attendance at management and/or Board meetings, each of the Defendants knew, or recklessly disregarded, the material facts surrounding Fiserv's financial condition, failures to conduct comprehensive internal review, and resulting misrepresentations and changes to guidance disseminated throughout July 2024 and October 2025. Further, despite such knowledge, the Fiserv Board neglected to prohibit or adopt the protocols to ensure reasonable and accurate public statements concerning the business and prohibit insiders from trading on material non-public information.   Therefore, a majority of the members of the Fiserv Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are complicit in and/or dependent upon other defendants who did.

101.    **Second**, Defendants Cohen, de Castro, DiSimone, Fritz, Gopal, Lyons, Mamilli, Simons, Warren, and Yarkoni breached their fiduciary duties by failing to implement and/or

enforce Board-level and/or Committee-level mechanisms for oversight to ensure Fiserv's adoption of protocols designed to ensure disclosure of accurate information and prohibit unlawful insider trading. For instance, Fiserv's Board, at all relevant times, lacked a Committee-level obligation or practice to monitor insider selling and use of MNPI by high-level corporate insiders. Further, the Board, at all relevant times, was derelict in its duty to uphold and enforce its Board-level obligations to ensure adherence to Fiserv's Code of Conduct and Governing Documents.

102.    **Third**, a majority of the members of Fiserv's Board has demonstrated an unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow and former directors and allies in the top ranks of the corporation for the violations of law complained of herein. The Board oversees a compensation recoupment, or "clawback," policy that, by its own terms and as applied, focuses narrowly on formal "misconduct" and affords the directors broad discretion whether to seek recoupment, thereby permitting senior executives to retain incentive-based pay even where their own failures injure the Company and its shareholders.

103.    In 2025, when a long-term shareholder proposed that the Board amend this clawback framework to strengthen recovery rights and require the Company to publicly report on any recoupment-related investigations or efforts, the Board did not simply recommend a vote against the proposal; it asked the Securities and Exchange Commission for permission to exclude the proposal from the proxy statement under Rule 14a-8(i)(10) on the ground that Fiserv had "substantially implemented" the requested reforms. The SEC rejected that attempt and found that the Company had not substantially implemented the proposal. After being rebuffed by the SEC, the Board urged shareholders to vote the proposal down and it was defeated.

104.    The Board then failed to respond to massive and expertly-timed stock sales by former Chief Executive Officer, director, and Defendant Frank Bisignano, who sold a substantial number of Fiserv shares for hundreds of millions of dollars shortly before the Company announced its third-quarter 2025 results and significantly revised its guidance downward.

105. Fiserv's own Code of Conduct emphasizes that insiders "may not trade while in possession" of material nonpublic information, and the Company has separately adopted a formal compensation recoupment policy, which provides that, "[i]n the event that any current or former recipient of the Company, its parent(s) or subsidiaries, violates the Company's code of conduct, causes reputational harm to the Company, or violates a restrictive covenant, the Company may recover from such individual up to the recoupment amount." These governing documents confirm that the Board has long recognized that insider trading and related misconduct warrant recoupment of incentive-based compensation, and that it possesses clear contractual authority to seek recovery from current and former executives whose conduct violates the Code or harms Fiserv's reputation.

106. Despite the undeniable evidence of insider trading and explicit authority in Fiserv's Governing Documents, there is no indication that the Board caused the Company to conduct a good-faith investigation into Defendant Bisignano's trades or to pursue any recoupment or disgorgement of his incentive-based compensation under the clawback policy. Any demand that the Board cause Fiserv to investigate Bisignano's trading and invoke the Company's recoupment policy to claw back his incentive-based compensation would therefore be futile: the Board has already chosen not to initiate any such investigation or recoupment efforts in spite of shameful publicity, and has affirmatively resisted efforts to strengthen and transparently apply any clawback protections.

107. Because the requested action would require the directors to admit that their prior refusal to investigate Bisignano's trading and to strengthen or transparently deploy the clawback policy was wrongful, and to take steps they have already affirmatively rejected, each director faces at least a substantial likelihood of liability and cannot be expected to exercise independent business judgment in responding to such a demand. Additionally, the Director Defendants have, as yet, taken no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

108. **Fourth,** the Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties

required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein and facilitated Brisignano's insider selling. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

109. **Fifth,** Defendants Warren, Cohen, DiSimone, Fritz, and Yarkoni (the "Audit Committee Defendants") were and are subject to, by virtue of their positions as Audit Committee members, the Audit Committee Charter. The Audit Committee Charter imposes and represents additional duties requiring the Audit Committee Defendants to, among other things: review and discuss financial statements and related disclosures and to discuss with management the Company's earnings guidance. The Audit Committee Defendants violated their duties under the Audit Committee Charter because they knowingly and/or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein, including but not limited to the misrepresentations related to restated earnings guidance pursuant to so-called "re-underwriting," and use of non-GAAP information. Because the Audit Committee Defendants violated duties imposed in the Audit Committee Charter, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

110. **Sixth,** Defendants Fritz, de Castro, Mamilli, and Simons (the "Nominating and Corporate Governance Committee Defendants") were and are subject to, by virtue of their positions as Nominating and Corporate Governance Committee members, the Nominating and Corporate Governance Charter. The Nominating and Corporate Governance Charter imposes and represents additional duties requiring the Nominating and Corporate Governance Committee Defendants to, among other things: monitor the independence, both in appearance and fact; to review the performance of the Chairman; to oversee annual evaluation of the Chief Executive Officer; to review and recommend changes to the Governance Guidelines of Fiserv. The

Nominating and Corporate Governance Committee Defendants violated their duties under the Nominating and Corporate Governance Charter because they knowingly and/or recklessly failed to monitor, investigate, and/or prohibit trading by a Chairman and Chief Executive Officer and failed to implement and enforce board-level and committee-level mechanisms to prevent violations of the Company's Code of Conduct and insider trading policy.

111. **Seventh**, any suit by the directors of Fiserv to remedy these wrongs would likely expose the liability of Defendants under applicable federal and state laws, which could result in lawsuits being filed against one or more of the Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

112. **Eighth**, the members of Fiserv's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action. Therefore, a demand upon the Fiserv Board is excused as futile.

113. **Ninth,** Defendant Lyons is employed full time by Fiserv as its CEO and has received and will continue to receive substantial monetary compensation because of that employment. By Fiserv's own proxy statements, Defendant Lyons is not independent, and therefore not disinterested. The Director Defendants will act to preserve and not threaten his position of control and the perquisites thereof. Therefore, the Director Defendants are incapable of exercising independent objective judgment in deciding whether to bring this action against Fiserv's directors.

114. **Tenth**, during the Relevant Period, Defendant Simons personally benefitted from wrongs alleged herein and made insider sales of 40,000 shares on October 23, 2024, when the Company's share price was inflated in part due to a share buy-back which he supported, to the tune of approximately $8 million.

115. Accordingly, a pre-suit demand on the Board is futile and excused.

116. Plaintiff has not made any demand on shareholders of Fiserv to institute this action since such demand would be a futile and useless act for the following reasons:

(i) Fiserv is a publicly traded company with more than 500 million shares outstanding, and thousands of shareholders;

(ii) making demand on that many shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(iii) making demand on all shareholders would be prohibitively expensive, assuming all shareholders could be individually identified.

## FIRST CAUSE OF ACTION
(Against the Individual Defendants for Breach of Fiduciary Duties)

117. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

118. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

119. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

120. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to disclose, inter alia, that:

(i) Fiserv compelled up to ~200,000 legacy Payeezy merchants to migrate to the higher-priced Clover platform, and as a result, Clover's 2024 revenue and GPV growth were temporarily and unsustainably boosted by these forced conversions, rather than by new-merchant growth, contrary to the Company's emphasis on "front-book" demand and minimal "back-book" contribution;

(ii)    A significant portion of former Payeezy merchants left and/or would leave Clover for cheaper competitors due to high pricing, poor service, and other operational issues, causing Clover GPV growth to slow materially and making previously assured growth rates unsustainable;

(iii)    That the July 2025 "re-underwtiting" and guidance refinement was not based on a comprehensive review of initiatives and products, and Fiserv did not disclose that its 2025 guidance was dependent on embedded assumptions which were "objectively difficult to achieve" even with "strong execution;"

(iv)    That Fiserv's Relevant Period financial results increasingly relied on deferred investments and short-term, in-quarter initiatives that boosted quarterly margins and revenue at the expense of long-term and sustainable client relationships, which was revealed following the sole "rigorous analysis" undertaken during the Relevant Period;

(v)    And, as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

121.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

122.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION
(Against the Individual Defendants for Waste of Corporate Assets)

123. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

124. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going. It resulted in continuous, connected, and ongoing harm to the Company.

125. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions; and (iv) spending billions of dollars of company money to purchase company shares at grossly inflated prices.

126. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

### THIRD CAUSE OF ACTION
(Against the Individual Defendants for Unjust Enrichment)

127. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

128. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

129. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

130. Plaintiff, as a shareholder and representative of the Company, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any

performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## FOURTH CAUSE OF ACTION
### (Against Defendants Bisignano and Simons for Insider Trading)

131.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

132.    By reason of their fiduciary role as officers and directors of the Company, Defendants Bisignano and Simons specifically owed the Company the highest obligation of due care, good faith, and loyalty.

133.    As directors and/or officers of the Company, Defendants Bisignano and Simons were given access to material information about the Company, as described above, which was not generally available to the public.

134.    When Defendants Bisignano and Simons sold their Company stock, as detailed *supra*, they were in possession of material, non-public information described above and sold Company stock on the basis of such information, at inflated prices, for collective gross proceeds in excess of $500 million.

135.    The information described above was proprietary, non-public information concerning the Company's business operations and financial condition. It was a proprietary asset belonging to the Company, which Defendants Bisignano and Simons misappropriated to their own benefit when they sold holdings in Company stock. Defendants Bisignano and Simons knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of the Company's stock.

136.    As the use of the Company's proprietary information for their own gain constitutes a breach of Defendant Bisignano's and Simons' fiduciary duties, the Company is entitled to disgorge any illegal profits obtained thereby.

## FIFTH CAUSE OF ACTION
### (Against Defendants Lyons and Bisignano for Contribution Under Sections 10(b) and 21D of the Exchange Act)

137.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

138.     Fiserv and Defendants Lyons and Bisignano are named as defendants in the SDNY Action, and Fiserv and Defendant Lyons are named as defendants in the ED WI Action. The Securities Class Actions assert claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC. If and when the Company is found liable in one or both of the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to Defendants Bisignano's and Lyon's willful and/or reckless violations of their obligations as officers and/or directors of Fiserv.

139.     Defendants Lyons and Bisignano, because of their positions of control and authority as officers and/or directors of Fiserv, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of Fiserv, including the wrongful acts complained of herein and in the Securities Class Actions. Defendants Lyons and Bisignano are "covered persons" per 15 U.S.C. § 78u-4(f)(10) because they are defendants in a private action arising under federal securities laws.

140.     Accordingly, Defendants Lyons and Bisignano are liable for contribution under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 21D(f) of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

141.     As such, Fiserv is entitled to receive all appropriate contribution or indemnification from Defendants Lyons and Bisignano.

142.     Plaintiff, on behalf of Fiserv, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.     Awarding, against all the Individual Defendants and in favor of the Company, the

damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' violations of Sections 10(b) and 20(a) of the Exchange Act;

C.      Awarding, against Defendants Bisignano and Simons and in favor of the Company, disgorgement of all illicitly gained proceeds in connection with their unlawful insider trading;

D.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, removing officers or directors from their positions, or adding officers or directors to the Company as warranted, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and risk management, and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board, and otherwise improve the policies and procedures by which the Board manages the business affairs of the Company;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and,

F.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  December 10, 2025

MALLERY SC

By:  *s/Andrew G. Frank*
Andrew G. Frank
731 North Jackson Street, Suite 900
Milwaukee, Wisconsin 53202
Tel: 414.271.2424
Fax: 414.271.8678
Email: afrank@mallerysc.com

*Local Counsel for Plaintiff Richard Martin*

THE SCHALL LAW FIRM
Brian J. Schall
Andrew J. Brown
Adam L. Rosen
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile: (213) 519-5876
brian@schallfirm.com
andrew@schallfirm.com
adam@schallfirm.com

*Counsel for Plaintiff Richard Martin*